**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAR 0 9 2023

TAMMY H. DOWNS, CLERK
By: _KHaya_
                                DEP CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

| | |
|---|---|
| NANDRE ERVIN, ) | **Case No.** 4:23-CV-185-KGB-PSH |
| PLAINTIFF, ) | |
| ) | |
| v. ) | |
| ) | |
| PULASKI COUNTY, ARKANSAS, an ) | **COMPLAINT FOR VIOLATIONS OF** |
| Arkansas municipality; SHERIFF ERIC ) | **THE CIVIL RIGHTS ACT OF 1871, 42** |
| HIGGINS, in his individual capacity; TURN ) | **U.S.C. § 1983** |
| KEY HEALTH CLINICS, LLC, an ) | |
| Oklahoma Limited Liability Company; ) | **JURY TRIAL DEMANDED** |
| KENDRA ROBERTS, APRN, in her ) | **PURSUANT TO FED. R. CIV. PRO. 38(a)** |
| individual capacity; and KATHERINE ) | **& (b)** |
| MILLIKAN, in her individual capacity, ) | |
| ) | This case assigned to District Judge _Baker_ |
| DEFENDANTS. ) | and to Magistrate Judge _Harris_ |

---

## COMPLAINT

---

TO THE HONORABLE DISTRICT COURT JUDGE:

Plaintiff Nandre Ervin (hereinafter "Plaintiff"), by and through his designated attorneys,

for his Complaint alleges as follows:

**I.**

### NATURE OF THE ACTION

1.    This suit is brought under the Civil Rights Act of 1871, 42 U.S.C. §§ 1983

("Section 1983") and 1988 and Arkansas common law to remedy Defendants' actions in causing

Plaintiff to be deprived of his constitutional rights by subjecting him to unlawful treatment

during his pre-trial detainment at the Pulaski County Jail (hereinafter the "Jail"), during which

time Defendants acted with deliberate indifference when they deprived him of basic, necessary,

and immediate medical care for his acute Uveitis which resulted in unnecessary emergency ocular surgery to save Plaintiff's eye sight. The Plaintiff suffered physical and emotional harm due to the Defendants' inhumane and deliberately indifferent actions.

## II.

## SUBJECT MATTER JURISDICTION AND VENUE

2.      This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a) on the grounds that the claims asserted herein arise under Section 1983 and Section 1988. This Court may exercise supplemental jurisdiction over any state law claims arising out of the acts and omissions described herein under 28 U.S.C. § 1367.

3.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a), (b) and (c) on the grounds that all or a substantial portion of the acts giving rise to the violations alleged herein occurred in this judicial district.

## III.

## THE PARTIES AND PERSONAL JURISDICTION

4.      Plaintiff is a resident of Jacksonville, Arkansas, located in Pulaski County.

5.      Defendant Pulaski County, Arkansas (hereinafter "Pulaski County") is an Arkansas municipality liable for its policies, customs, practices, and the failure to train its employees, is a party defendant to this matter. Service upon Pulaski County is perfected by service upon the Pulaski County Judge, Barry Hyde, who serves as the Chief Executive Officer of the County, at 201 S. Broadway, Suite 400, Little Rock, AR, 72201. Pulaski County is a political subdivision of the State of Arkansas and among its other functions operates and maintains a law enforcement agency known as the Pulaski County Sheriff's Department. At all times hereto, Pulaski County and its agents acted under color of state law.

2

6.     Defendant Eric Higgins (hereinafter "Defendant Higgins") was elected in 2019 and still serves as the Sheriff of Pulaski County, Arkansas with the statutory responsibility for the safe and constitutional operation of the Pulaski County Jail. He is a Pulaski County employee. Defendant Higgins can be served at 2900 S. Woodrow Street, Little Rock, AR 72204. Again, Defendant Higgins is being sued in his individual capacity.

7.     Defendant Turn Key Health Clinics, LLC, (hereinafter Defendant "Turn Key" or "Turn Key") is a limited liability company organized under the laws of the State of Oklahoma authorized to do business in Arkansas, with its principal place of business located at 900 NW 12th Street, Oklahoma City, Oklahoma, 73106. Service of process may be made by serving its registered agent, Jesse White at that location. It also has a registered agent in Arkansas. That being Incorp Services, Inc. located at 4250 Venetian Lane, Fayetteville, Arkansas 72703. Turn Key is a private entity hired by Pulaski County, Arkansas to provide healthcare services at the Pulaski County Jail (hereinafter the "Jail") located at 3201 West Roosevelt Road, Little Rock, Arkansas 72204. At all times relevant to this Complaint, Defendant Turn Key had an obligation to provide appropriate medical care to Plaintiff when he was a pre-trial detainee at the Jail, or any other place Defendant Turn Key treated or had an obligation to treat him, and to arrange for him to be evaluated by medical staff (on-site or off-site, as appropriate) when necessary. Defendant Turn Key was responsible for the continuity of care received or not received by Plaintiff throughout his custody at the Jail. Defendant Turn Key is vicariously liable for the acts or omissions of the individuals responsible for providing care to Plaintiff at the Jail and any and all agents (actual or apparent) who were negligent in the care/treatment they provided to Plaintiff. Turn Key is also responsible for the violation of Plaintiff's rights under the Fourteenth Amendment to the United States Constitution as a result of its policies or customs. Plaintiff

3

alleges that all agents of Defendant Turn Key including but not limited to nurse practitioners, nurses, technicians, staff and any and all other health care providers who treated or should have treated and failed to treat Plaintiff or who were in any way involved in Plaintiff's care or the failure to provide adequate care at the Jail were acting in the course and scope of their agency and/or employment with Turn Key at all times relevant to this action. By way of alternative pleading, and upon information and belief, all of the nurse practitioners, nurses, technicians, staff, and other health care providers who cared for or treated or should have treated and failed to adequately treat Plaintiff during all times relevant to this claim were apparent agents of Turn Key. Upon further information and belief, Turn Key knowingly permitted the healthcare providers to hold themselves out as agents of Turn Key and/or Turn Key held out the healthcare providers as agents and Plaintiff reasonably believed they were agents of Turn Key and relied upon that belief. Moreover, Turn Key was responsible for developing and implementing policies, protocols, procedures and systems for the purpose of providing individuals at the Jail with reasonable and safe care and with ensuring that the rights of inmates under the 14th Amendments to the United States Constitution were protected at all times relevant to this claim and failed to do so with regard to Plaintiff. At all times relevant to this Complaint, Turn Key acted under color of law, performed government functions, was entwined in a symbiotic relationship with Pulaski County, and was otherwise engaged in state action consistent with the Supreme Court's analysis in *Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n,* 531 U.S. 288 (2000). Turn Key is a "person" within the meaning of 42 U.S.C. § 1983.

8.    Defendant Kendra Roberts, APRN (hereinafter "Nurse Roberts") is the Turn Key nurse practitioner that was responsible for the treatment and care of Plaintiff while at the Jail. Service of process may be made upon Nurse Roberts at the Jail.

4

9.      Defendant Katherine Millikan (hereinafter "Defendant Millikan") is a Turn Key employee, believed to be either a nurse or a medical assistant, that was responsible for the treatment and care of Plaintiff while at the Jail. Service of process may be made upon Defendant Millikan at the Jail.

10.      As used herein, the phrase "Turn Key Nurses" refers to Defendants Kendra Roberts and Katherine Millikan, both collectively and individually.

**IV.**

**FACTUAL ALLEGATIONS**

11.      Plaintiff is a 49-year-old African American veteran who proudly served his nation.

12.      In December of 2016, Turn Key secured their fifth jail contract in Arkansas when it secured its contract with the Pulaski County Jail. Turn Key's $3.7 million annual contract replaced the jail's previous $4.45 million medical budget, saving Pulaski County $750,000 annually. Turn Key co-founder and Director Jon Echols in his sales pitch to the Pulaski County Sheriff said: "You run the jail and leave medical care to us."[1] Pulaski County agreed.

13.      Upon statements of Jon Echols, Turn Key is responsible for implementing the Jail's policies, customs, and practices for providing medical care to those housed at the Jail. When Pulaski County hired Turn Key to provide services to its pre-trial detainee population, Turn Key became the policymaker for Pulaski County, and Pulaski County established a policy and custom of acquiescing in Turn Key's actions in providing medical care. Put another way, Turn Key's practice or custom of allowing its employees to make detrimental and reckless decisions about medical care may still be imputed onto Pulaski County.[2]

---

[1] Arkansas jails turn to private providers for health care (arkansasonline.com)

[2] Plaintiff cites two cases for this proposition. *See Mandel v. Doe*, 888 F.2d 783 (11th Cir. Nov. 17, 1989) and *Nance v. Wayne County*, 264 F.E.D. 331 (M.D. Tenn. Oct. 15, 2009). In *Mandel*, the Eleventh Circuit upheld the district

14.    On March 15, 2020, Plaintiff was transported to the Jail as a pre-trial detainee.

15.    At the Jail, Plaintiff received an intake medical screening performed by Turn Key employee, Kimberlyn Beard. A full copy of Plaintiff's Turn Key medical records are filed with this Court under seal as **Exhibit A**. In that screening Plaintiff identified that he suffered from Uveitis which required treatment with eye drops. (Exhibit A, pp. 2 & 3.)

16.    Uveitis is a form of eye inflammation that affects the middle layer of tissue in the eye wall. Uveitis warning signs often come on suddenly and get worse quickly. Those warning signs include eye redness, pain, and blurred vision. Uveitis is a serious medical condition which can lead to permanent vision loss. Early diagnosis and treatment are important to prevent complications and to preserve vision.[3]

17.    On March 27, 2020, at or around 10:00 p.m., Plaintiff approached the Deputy Station in the Jail complaining about feeling like he was going to pass out. Correctional Officer Robert Torres notified medical personnel to the W-3 Unit.

18.    Shortly thereafter Defendant Millikan evaluated Plaintiff. At that time, Plaintiff complained of feeling dizzy like he was going to pass out, stomach pain, right eye pain/burning, dizziness, light headedness, and a pounding headache. Additionally, he was continuously rubbing his eyes. (*See* Id. at p. 39). Rather than properly evaluating issues with Plaintiff's

---

court's denial of a directed verdict for the County, and thus affirmed that the County was liable under § 1983. The Court determined that the County Health Department physician's assistant exhibited deliberate indifference to Mandel's serious medical needs. *Mandel*, 888 F.2d at 787-90. The Court also agreed that based on the Memorandum of Understanding between the County and the County's Health Department regarding medical care at the prison, the physician's assistant was the sole and final policymaker with respect to medical affairs at the facility. Therefore, the actions of the physician's assistant were attributed to the County in order to establish liability under § 1983 (*Id.* at 791-95.) *Nance* involved a suit against a local County and Sheriff's department for inadequate medical care of a prisoner. *Nance*, 264 F.R.D. at 355.

[3] Uveitis - Symptoms and causes - Mayo Clinic

Uveitis, Defendant Millikan diagnosed dehydration and instructed Plaintiff to drink water and use ice chips to help rehydrate Plaintiff. (Id.)

19.     At or around midnight, the Duty Sergeant contacted medical again stating that Plaintiff continued to complain of feeling like he would pass out. Again, rather than properly evaluating issues with Plaintiff's Uveitis or transporting him to an appropriate medical facility for necessary emergency treatment for his serious medical condition, Turn Key employees rather just used a sterile purified water ophthalmic solution to rise out his eye (*See* Id.) in an attempt to keep costs low for the facility and then cleared him to remain in the unit. (*See* Id. at p. 17).

20.     On March 28, 2020, between 4:30 a.m. and 5:00 a.m., another deputy in D unit contacted Turn Key employees stating that Plaintiff could not see at all out of his right eye. Plaintiff was again assessed. At this time his right eye continued to be tearing with red sclera and a clouded appearance over the iris and pupil. Defendant Millikan then contacted the provider, Defendant Roberts, APRN. (Id. at p. 39).

21.     Despite having knowledge of Plaintiff's Uveitis and without physically examining Plaintiff's condition, Defendant Roberts ordered prednisone ophthalmic solution and gentamycin ophthalmic antibiotic and to keep his right eye covered loosely. (Id.) Defendant Roberts knew or should have known of the serious risks of failing to transport a patient suffering from acute Uveitis symptoms to an appropriate medical facility. Despite knowing of this risk, Defendant Roberts failed to order the immediate transport of Plaintiff to an appropriate medical facility for necessary emergency treatment for Plaintiff's serious medical condition.

22.     Defendant Millikan also knew or should have known of the serious risks of failing to transport a patient suffering from acute Uveitis symptoms to an appropriate medical facility. Defendant Millikan also knew or should have known that the severe exacerbation of a

7

preexisting condition such as Uveitis necessitated an in-person physical examination by a qualified healthcare provider, not merely a call to a nurse practitioner who was not in the facility. Despite knowing of this risk, Defendant Millikan failed to order Plaintiff's immediate transport to an appropriate medical facility for necessary emergency treatment for Plaintiff's serious medical condition. In the alternative, Defendant Millikan failed to properly communicate the severity of Plaintiff's symptoms to Defendant Roberts and failed to advocate for her patient acting with deliberate indifference to his serious medical needs.

23.    Plaintiff was forced to suffer between March 28 – March 31 with excruciating pain and the inability to use his eyes. At no time during those four (4) days did Defendant Roberts ever physically examine Plaintiff. Rather, Plaintiff was subjected to the continued inappropriate and insufficient regimen of purported treatment that actually amounted to no treatment at all.

24.    Finally, on March 31, 2020, after unnecessarily suffering for four straight days Plaintiff was transferred to UAMS Emergency Department for emergency ocular surgery. (Id. at pp. 17-18.) Turn Key employees even logged that the medical transfer was for Vulvitis rather than Uveitis. Vulvitis is the inflammation of the vulva, an organ which Plaintiff, being male, does not even possess. (Id. at p. 17).

25.    The offsite notification in Turn Key's system claims that the injury was not caused by Acts or Omissions by the County, that this was not a pre-existing condition, and that this was a new condition. (Id. at p. 18.) All of this information is patently false. Plaintiff's pre-existing condition was exacerbated by four days of receiving no examination, and thus no real treatment, whatsoever. The transfer occurred because Plaintiff's eye was swollen shut, his sclera

was completely red with a white cloud over his iris and pupil, Plaintiff could no longer open his eye, Plaintiff could no longer see out of his eye, and his eye was constantly draining. (Id.)

26.    On March 31, 2020, at or around 4:10 p.m. a UAMS employee, Pam, called requesting information about Plaintiff because he arrived in handcuffs with deputy supervision and was now uncuffed and unsupervised. Turn Key employee, Hannah Weatherly, informed Pam that Plaintiff was released and no longer in custody. (Id.)

27.    The sheer audacity that the County and Turn Key released Plaintiff from their custody while he received emergency ocular surgery in order to avoid paying his UAMS medical bills, which were the direct result of their deliberate indifference to his serious medical conditions shocks the conscious.

### VI.
### CAUSES OF ACTION

### COUNT 1 – VIOLATION OF 42 U.S.C. § 1983
### (AGAINST PULASKI COUNTY)

28.    Plaintiff re-alleges paragraphs 1-27 of this Complaint as if set forth verbatim herein.

29.    As alleged above the County acting under color of state law, violated the rights of Plaintiff secured by the Fourteenth Amendment to the U.S. Constitution. Specifically, the Pulaski County Sheriff, Pulaski County Jail Director, Pulaski County Assistant Director of Jail Programs, the Pulaski County Jail Medical Director, and the various other officials responsible for making policy with regard to the Sheriff's Department and Jail enacted policies and customs that were deliberately indifferent to and caused the violation of Plaintiff's constitutional rights.

30.     Further, Pulaski County, acting by and through its policymakers, officers, and agents, and acting under color of state law, violated the rights of Plaintiff secured by the Fourteenth Amendment to the U.S. Constitution.

31.     Defendant Pulaski County, acting by and through its policymakers, officers, and agents with deliberate indifference, implemented customs and policies and/or at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the individuals who violated the above-described constitutional rights of Plaintiff. These policies and customs directly and proximately caused the above-described constitutional rights violations.

32.     In the alternative, Defendant Pulaski County, acting by and through its policymakers, officers, and agents with deliberate indifference, failed to properly hire or train its agents and employees with respect to their responsibilities in ensuring that they provide reasonable medical care, which proximately caused the above-described constitutional rights violations.

## COUNT 2 – VIOLATION OF 42 U.S.C. § 1983
## (AGAINST TURN KEY)

33.     Plaintiff re-alleges paragraphs 1-27 of this Complaint as if set forth verbatim herein.

34.     At all times relevant to this Complaint, the Turn Key acted under color of law, performed government functions, was entwined in a symbiotic relationship with Pulaski County, and were otherwise engaged in state action consistent with the Supreme Court's analysis in *Brentwood Acad. V. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288 (2000). Turn Key is a "person" within the meaning of 42 U.S.C. § 1983.

35.     Turn Key directly participated in and proximately caused the above-described constitutional rights violations by instituting policies and customs described herein with

deliberate indifference to the serious medical needs of individuals like Plaintiff, specifically including, but not limited to, Turn Key's policies of permitting unqualified personnel to conduct medical examinations and simply convey symptoms to medical providers by telephone, failing to require medical providers examine pre-trial detainees in person within a reasonable time of their injury, and its policy of failing to transport pre-trial detainees with acute, emergent medical conditions to UAMS or another medical facility for necessary acute or emergency medical treatment.

36.    To the extent that Turn Key claim their subordinates are the actual persons who were deliberately indifferent to the serious medical needs of Plaintiff and that they were not personally involved themselves, Turn Key at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of these offending subordinates. As a result, Turn Key is personally liable under Section 1983. *See Tilson v. Forrest City Police Dep't*, 28 F.3d 802, 806-07 (8th Cir. 1994). (A supervisor may be held liable under § 1983 if he directly participated in the constitutional violation or if his failure to train or supervise the offending actor caused the deprivation. A plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate.)

37.    Turn Key, acting by and through its policymakers, officers, and agents with deliberate indifference, implemented customs and policies and/or at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the individuals who violated the above-described constitutional rights of Plaintiff. These policies and customs directly and proximately caused the above-described constitutional rights violations resulting in Plaintiff's unnecessary suffering.

38.     In the alternative, if Turn Key claims that the conduct described herein is contrary to its policies, then Turn Key, acting by and through its policymakers, officers, and agents and with deliberate indifference, failed to properly train or supervise its agents and employees with respect to their responsibilities in ensuring that they provide reasonable medical care, which proximately caused the above-described constitutional rights violations.

### COUNT 3 – VIOLATION OF 42 U.S.C. § 1983
### (AGAINST TURN KEY NURSES)

39.     Plaintiff re-alleges paragraphs 1-27 of this Complaint as if set forth verbatim herein.

40.     At all times relevant to this Complaint, the Turn Key Nurses acted under color of law, performed government functions, were entwined in a symbiotic relationship with Pulaski County and were otherwise engaged in state action consistent with the Supreme Court's analysis in *Brentwood Acad. V. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288 (2000). The Turn Key Nurses are "persons" within the meaning of 42 U.S.C. § 1983.

41.     The Turn Key Nurses, acting with deliberate indifference, directly participated in and proximately caused the above-described constitutional rights violations by deliberately ignoring Plaintiff's serious medical needs.

42.     The Turn Key Nurses were responsible for providing treatment and care to Plaintiff during his pre-trial detainment at the Jail and were responsible for providing and/or supervising the medical treatment of Plaintiff.

43.     A layperson would be aware that Plaintiff's symptoms indicated a need for acute or emergency medical care and, at a minimum, an in-person examination by a medical provider.

44.     The Turn Key Nurses knew or had reason to know that Plaintiff had a serious medical need that required immediate emergent treatment and that there was a risk that Plaintiff

12

would suffer immensely or lose his eye sight if he did not receive immediate emergent treatment. The Turn Key Nurses were informed of that risk by Plaintiff. The Turn Key Nurses inexcusably disregarded that risk by failing to adequately and accurately document Plaintiff's medical conditions, by failing to physically examine Plaintiff, by failing, by failing to immediately transport Plaintiff for emergency medical care when a healthcare provider was not physically present in the facility, by failing to respond to Plaintiff's calls for help, by failing to recognize that Plaintiff's Uveitis was in need of emergent care, by failing to respond to Plaintiff's serious medical need even after he informed them he was about to pass out, and by failing to immediately transport Plaintiff to UAMS or another appropriately equipped facility to ensure that Plaintiff received necessary emergency ocular surgery necessary to save his vision.

45.     The Turn Key Nurses were subjectively aware of a serious risk to Plaintiff and disregarded that risk by failing to take reasonable steps to abate it. The Turn Key Nurses, acting recklessly and with deliberate indifference, chose to ignore Plaintiff's serious medical needs and did not provide the medical care that they were aware he required. All of the failures of the Turn Key Nurses to properly examine, treat, or transport Plaintiff to UAMS in a timely manner was so woefully inadequate as to amount to no treatment at all.

46.     The Turn Key Nurses' failures to provide necessary medical care resulted in Plaintiff suffering excruciatingly pain for four (4) days as he lie in his bed unable to open his eyes.

## COUNT 4 – MEDICAL NEGLIGENCE
## (AGAINST TURN KEY AND TURN KEY NURSES)

47.     Plaintiff re-alleges paragraphs 1-27 of this Complaint as if set forth verbatim herein.

48.     At all times relevant to this Complaint, Turn Key and the Turn Key Nurses owed

13

Plaintiff a duty of care to provide medical care that met the standard of care in Pulaski County, Arkansas and to arrange for him to be evaluated by medical staff (on-site or off-site, as appropriate) when necessary. Turn Key and the Turn Key Nurses were responsible for the continuity of care received or not received by Plaintiff.

49. Turn Key, through its agents including the Turn Key Nurses, owed a duty to its patients, including Plaintiff, to provide care, treatment and services as reasonably prudent healthcare providers under same or similar circumstances, including proper evaluation, diagnosis and care of patients like Plaintiff. Further Turn Key had a duty to provide treatment within the applicable standard of care of this or a similar community and take all reasonable steps to ensure that its staff where it was treating patients delivered care and services to patients in accordance with Turn Key's orders, care plan interventions, and policies.

50. Turn Key's agents breached the duty of care in ways that include but are not limited to the following:

      1. failed to properly evaluate, diagnose, treat and monitor Plaintiff's condition;

      2. failed to implement and provide an appropriate treatment plan; and
      3. unreasonably delayed Plaintiff's transport to an appropriately-equipped medical facility.

51. Turn Key breached its duty owed to Plaintiff and failed to provide treatment within the applicable standard of care of this or a similar community by not providing proper evaluation, diagnosis and treatment and further failing to take all reasonable steps to ensure the staff and nurses delivered care and services to patients in accordance with Turn Key's orders, care plan interventions, and policies, and these breaches were the direct and proximate cause of the damages, and injuries suffered by Plaintiff described herein.

52. Turn Key owed a duty to patients, including Plaintiff, to hire, train and supervise

14

its nurses and staff to ensure said nurses and staff delivered care and services to patients in accordance with physician orders, care plan interventions, and its policies with appropriate timing and technique in the performance of orders. Turn Key further owed a duty to patients, including Plaintiff, to appropriately credential, evaluate, employ and supervise its nurses and staff.

53.    Turn Key breached its duty to Plaintiff by failing to hire, train and supervise its nurses and staff to ensure said nurses and staff delivered care and services to patients in accordance with physician orders, care plan interventions, and its policies with appropriate timing and technique in the performance of orders. Turn Key further recklessly failed to provide Plaintiff with nurses and staff appropriately credentialed, evaluated, employed and supervised. Turn Key was aware of the defects in the credentialing and qualifications of its nurses and staff and was aware that such defects posed a substantial and unjustifiable risk to patients including Plaintiff, but consciously disregarded such defects and risks. All of those breaches, acts and omissions were the direct and proximate cause of the damages and injuries suffered by Plaintiff described herein.

54.    These deviations from the standard care resulted in liability for Turn Key and are the direct and proximate cause of Plaintiff's previously-described physical injuries, pain, suffering, and emotional distress.

## IX.
## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants on each Count of the Complaint and prays for the following relief:

1.    Issue service of process and serve the Defendants;

2.    Permit Plaintiff leave to amend this Complaint after reasonable discovery;

15

3.    Empanel a jury to try this matter;

4.    Award Plaintiff compensatory damages, both economic and non-economic;

5.    Award Plaintiff punitive damages;

6.    Award Plaintiff his reasonable attorney's fees, costs, and expenses pursuant to 42

U.S.C. § 1988 and Ark. Code Ann. § 16-123-105(b);

7.    Award costs and expenses incurred in this action pursuant to Rule 54 of the

Federal Rules of Civil Procedure; and

8.    Grant the Plaintiff such further relief as the Court may deem just and proper.

Respectfully submitted,

Craig A. Edgington (#38205)
Brice M. Timmons (#29582)
DONATI LAW, PLLC
1545 Union Avenue
Memphis, TN  38104
(901) 278-1004 (Office)
(901) 278-3111 ( Fax)
craig@donatilaw.com
brice@donatilaw.com