IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

| | | |
|---|---|---|
| NANDRE ERVIN, | ) | **Case No.   4:23-cv-185-KGB-PSH** |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PULASKI COUNTY, ARKANSAS, an | ) | **COMPLAINT FOR VIOLATIONS OF** |
| Arkansas municipality; SHERIFF ERIC | ) | **THE CIVIL RIGHTS ACT OF 1871, 42** |
| HIGGINS, in his individual capacity; TURN | ) | **U.S.C. § 1983** |
| KEY HEALTH CLINICS, LLC, an | ) | |
| Oklahoma Limited Liability Company; | ) | **JURY TRIAL DEMANDED** |
| KENDRA ROBERTS, APRN, in her | ) | **PURSUANT TO FED. R.  CIV. PRO. 38(a)** |
| individual capacity; and KATHERINE | ) | **& (b)** |
| MILLIKAN, in her individual capacity, | ) | |
| | ) | |
| DEFENDANTS. | ) | |

---

**FIRST AMENDED COMPLAINT**

---

TO THE HONORABLE DISTRICT COURT JUDGE:

Plaintiff Nandre Ervin (hereinafter "Plaintiff"), by and through his designated attorneys,

for his First Amended Complaint alleges as follows:

**I.**

**NATURE OF THE ACTION**

1.      This suit is brought under the Civil Rights Act of 1871, 42 U.S.C. §§ 1983

("Section 1983") and 1988 and Arkansas common law to remedy Defendants' actions in causing

Plaintiff to be deprived of his constitutional rights by subjecting him to unlawful treatment

during his pre-trial detainment at the Pulaski County Jail (hereinafter the "Jail"), during which

time Defendants acted with deliberate indifference when they deprived him of basic, necessary,

and immediate medical care for his acute Uveitis which resulted in unnecessary emergency ocular surgery to save Plaintiff's eye sight. The Plaintiff suffered physical and emotional harm due to the Defendants' inhumane and deliberately indifferent actions.

## II.

## SUBJECT MATTER JURISDICTION AND VENUE

2.      This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a) on the grounds that the claims asserted herein arise under Section 1983 and Section 1988. This Court may exercise supplemental jurisdiction over any state law claims arising out of the acts and omissions described herein under 28 U.S.C. § 1367.

3.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a), (b) and (c) on the grounds that all or a substantial portion of the acts giving rise to the violations alleged herein occurred in this judicial district.

## III.

## THE PARTIES AND PERSONAL JURISDICTION

4.      Plaintiff is a resident of Jacksonville, Arkansas, located in Pulaski County.

5.      Defendant Pulaski County, Arkansas (hereinafter "Pulaski County") is an Arkansas municipality liable for its policies, customs, practices, and the failure to train its employees, is a party defendant to this matter. Service upon Pulaski County is perfected by service upon the Pulaski County Judge, Barry Hyde, who serves as the Chief Executive Officer of the County, at 201 S. Broadway, Suite 400, Little Rock, AR, 72201. Pulaski County is a political subdivision of the State of Arkansas and among its other functions operates and maintains a law enforcement agency known as the Pulaski County Sheriff's Department.  At all times hereto, Pulaski County and its agents acted under color of state law.

6.     Defendant Eric Higgins (hereinafter "Defendant Higgins") was elected in 2019 and still serves as the Sheriff of Pulaski County, Arkansas with the statutory responsibility for the safe and constitutional operation of the Pulaski County Jail. He is a Pulaski County employee. Defendant Higgins can be served at 2900 S. Woodrow Street, Little Rock, AR 72204. Again, Defendant Higgins is being sued in his individual capacity.

7.     Defendant Turn Key Health Clinics, LLC, (hereinafter Defendant "Turn Key" or "Turn Key") is a limited liability company organized under the laws of the State of Oklahoma authorized to do business in Arkansas, with its principal place of business located at 900 NW 12th Street, Oklahoma City, Oklahoma, 73106. Service of process may be made by serving its registered agent, Jesse White at that location. It also has a registered agent in Arkansas. That being Incorp Services, Inc. located at 4250 Venetian Lane, Fayetteville, Arkansas 72703. Turn Key is a private entity hired by Pulaski County, Arkansas to provide healthcare services at the Pulaski County Jail (hereinafter the "Jail") located at 3201 West Roosevelt Road, Little Rock, Arkansas 72204. At all times relevant to this Complaint, Defendant Turn Key had an obligation to provide appropriate medical care to Plaintiff when he was a pre-trial detainee at the Jail, or any other place Defendant Turn Key treated or had an obligation to treat him, and to arrange for him to be evaluated by medical staff (on-site or off-site, as appropriate) when necessary. Defendant Turn Key was responsible for the continuity of care received or not received by Plaintiff throughout his custody at the Jail. Defendant Turn Key is vicariously liable for the acts or omissions of the individuals responsible for providing care to Plaintiff at the Jail and any and all agents (actual or apparent) who were negligent in the care/treatment they provided to Plaintiff. Turn Key is also responsible for the violation of Plaintiff's rights under the Fourteenth Amendment to the United States Constitution as a result of its policies or customs. Plaintiff

3

alleges that all agents of Defendant Turn Key including but not limited to nurse practitioners, nurses, technicians, staff and any and all other health care providers who treated or should have treated and failed to treat Plaintiff or who were in any way involved in Plaintiff's care or the failure to provide adequate care at the Jail were acting in the course and scope of their agency and/or employment with Turn Key at all times relevant to this action. By way of alternative pleading, and upon information and belief, all of the nurse practitioners, nurses, technicians, staff, and other health care providers who cared for or treated or should have treated and failed to adequately treat Plaintiff during all times relevant to this claim were apparent agents of Turn Key. Upon further information and belief, Turn Key knowingly permitted the healthcare providers to hold themselves out as agents of Turn Key and/or Turn Key held out the healthcare providers as agents and Plaintiff reasonably believed they were agents of Turn Key and relied upon that belief. Moreover, Turn Key was responsible for developing and implementing policies, protocols, procedures and systems for the purpose of providing individuals at the Jail with reasonable and safe care and with ensuring that the rights of inmates under the 14th Amendments to the United States Constitution were protected at all times relevant to this claim and failed to do so with regard to Plaintiff. At all times relevant to this Complaint, Turn Key acted under color of law, performed government functions, was entwined in a symbiotic relationship with Pulaski County, and was otherwise engaged in state action consistent with the Supreme Court's analysis in *Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288 (2000). Turn Key is a "person" within the meaning of 42 U.S.C. § 1983.

8.     Defendant Kendra Roberts, APRN (hereinafter "Nurse Roberts") is the Turn Key nurse practitioner that was responsible for the treatment and care of Plaintiff while at the Jail. Service of process may be made upon Nurse Roberts at the Jail.

4

9.     Defendant Katherine Millikan (hereinafter "Defendant Millikan") is a Turn Key employee, believed to be either a nurse or a medical assistant, that was responsible for the treatment and care of Plaintiff while at the Jail. Service of process may be made upon Defendant Millikan at the Jail.

**IV.**

**FACTUAL ALLEGATIONS**

10.    Plaintiff is a 49-year-old African American veteran who proudly served his nation.

11.    Since 2015, over one-hundred and sixty inmates have filed suit against Turn Key for deliberate indifference to their medical needs. Greater than thirty (30) of those cases involved the death of inmates or detainees.[1]

12.    In some of Turn Key's contracts, it agrees to pay a substantial portion of all off-site medical treatment before a county is required to assist in these costs. Terms such as these create incentives to cut costs by not sending patients out to hospitals.[2]

13.    A former Turn Key employee with extensive nursing experience provided statements to *Newsweek* on condition of anonymity for fear of retribution and stated that Turn Key employees felt cost pressures and routinely had to go over the Turn Key doctor's heads to get patients off-site care. She stated, "I would call the physician, like, 'I really feel like this guy needs to got to the emergency room.' They would be like 'No.' and wouldn't listen to me."[3]

---

[1] Valerie Bauman and Eric Ferkenhoff, *Turn Key Health Clinics, criticized for its staffing levels, has been sued at least 160 times since 2015,* Newsweek (April 14, 2023, 5:00 AM), https://www.newsweek.com/private-health-provider-arkansas-jail-faces-dozens-lawsuits-1792341

[2] *Id.*

[3] *Id.*

14.    In the early 1970s, an American Medical Association ("AMA") study of jails found inadequate, disorganized health services and a lack of national standards. In collaboration with other organizations, the AMA established a program that in 1983 became an independent, 501(c)(3) nonprofit organization: the National Commission on Correctional Health Care ("NCCHC"). The mission of NCCHC is to improve the quality of health care in jails, prisons, and juvenile confinement facilities by utilizing national standards.

15.    Turn Key has elected to avoid accreditation by NCCHC or other correctional health care commissions because this would require site visits and evaluations on their services provided. In Arkansas, Turn Key only has one jail in all of the state's 75 counties accredited. This is a trend throughout all Turn Key facilities. For example, in Oklahoma, where Turn Key was established and maintains a huge presence, only the Tulsa County jail is accredited.[4]

16.    In December of 2016, Turn Key secured their fifth jail contract in Arkansas when it secured its contract with the Pulaski County Jail. Turn Key's $3.7 million annual contract replaced the jail's previous $4.45 million medical budget, saving Pulaski County $750,000 annually. Turn Key co-founder and Director Jon Echols in his sales pitch to the Pulaski County Sheriff said: "You run the jail and leave medical care to us."[5] Pulaski County agreed.

17.    Upon statements of Jon Echols, Turn Key is responsible for implementing the Jail's policies, customs, and practices for providing medical care to those housed at the Jail. When Pulaski County hired Turn Key to provide services to its pre-trial detainee population, Turn Key became the policymaker for Pulaski County, and Pulaski County established a policy

---

[4] *Id.*

[5] Brandon Mulder, *Arkansas jails turn to private providers for health care* Arkansas Democrat Gazette (September 4, 2017, 4:30 AM), https://www.arkansasonline.com/news/2017/sep/04/jails-turn-to-private-providers-for-hea-1/

and custom of acquiescing in Turn Key's actions in providing medical care. Put another way, Turn Key's practice or custom of allowing its employees to make detrimental and reckless decisions about medical care may still be imputed onto Pulaski County.[6]

18.     On March 15, 2020, Plaintiff was transported to the Jail as a pre-trial detainee.

19.      At the Jail, Plaintiff received an intake medical screening performed by Turn Key employee, Kimberlyn Beard. A full copy of Plaintiff's Turn Key medical records were previously filed with this Court under seal as ECF No. 4 and are incorporated by reference. In that screening Plaintiff identified that he suffered from Uveitis which required treatment with eye drops. (ECF No. 4, pp. 2 & 3.)

20.     Uveitis is a form of eye inflammation that affects the middle layer of tissue in the eye wall. Uveitis warning signs often come on suddenly and get worse quickly. Those warning signs include eye redness, pain, and blurred vision. Uveitis is a serious medical condition which can lead to permanent vision loss. Early diagnosis and treatment are important to prevent complications and to preserve vision.[7]

_____

[6] Plaintiff cites two cases for this proposition. *See Mandel v. Doe*, 888 F.2d 783 (11th Cir. Nov. 17, 1989) and *Nance v. Wayne County*, 264 F.E.D. 331 (M.D. Tenn. Oct. 15, 2009). In *Mandel*, the Eleventh Circuit upheld the district court's denial of a directed verdict for the County, and thus affirmed that the County was liable under § 1983. The Court determined that the County Health Department physician's assistant exhibited deliberate indifference to Mandel's serious medical needs. *Mandel*, 888 F.2d at 787-90. The Court also agreed that based on the Memorandum of Understanding between the County and the County's Health Department regarding medical care at the prison, the physician's assistant was the sole and final policymaker with respect to medical affairs at the facility. Therefore, the actions of the physician's assistant were attributed to the County in order to establish liability under § 1983 (*Id.* at 791-95.) *Nance* involved a suit against a local County and Sheriff's department for inadequate medical care of a prisoner. *Nance*, 264 F.R.D. at 355.

[7]   Mayo Clinic Staff, *Uveitis*, (May 07, 2023),   https://mayoclinic.org/diseases-conditions/uveitis/symptoms-causes/syn-20378734

21.    Essential signs and symptoms that reflect a true uveitic emergency are pain, redness, photophobia, floaters, blurry vision, and scotoma. Failure to recognize these essential signs and symptoms of a true uveitic emergency may result in a devastating visual outcome. Immediate recognition and urgent intervention in the emergency room are needed to prevent severe permanent visual loss.[8]

22.    On March 27, 2020, at or around 10:00 p.m., Plaintiff approached the Deputy Station in the Jail complaining about feeling like he was going to pass out. Correctional Officer Robert Torres notified medical personnel to the W-3 Unit.

23.    Shortly thereafter Defendant Millikan evaluated Plaintiff. At that time, Plaintiff complained of feeling dizzy like he was going to pass out, stomach pain, right eye pain/burning, dizziness, light headedness, and a pounding headache. Additionally, he was continuously rubbing his eyes. (*See* Id. at p. 39).

24.    Defendant Millikan was informed by Plaintiff of his Uveitis. Additionally, she knew or should have known of this condition due to Plaintiff's medical records prior to evaluating him. Despite knowing of Plaintiff's serious medical condition, the fact that Plaintiff was suffering symptoms consistent with a flare up of his Uveitis, and that failing to treat Uveitis immediately could lead to permanent vision loss, Defendant Millikan chose to disregard Plaintiff's complaint and falsely dismiss it as dehydration.[9] (Id.)

---

[8] Hassan A. Al-Dhibi, et al., *A systematic Approach to Emergencies in Uveitis*, National Library of Medicine (Jul-Sep 2014), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4123279/

[9] Eye pain and *burning* are not generally accepted symptoms of dehydration. *See* Mayo Clinic Staff, *Dehydration*, (October 14, 2021), https://mayoclinic.org/diseases-conditions/dehydration/symptoms-causes/syc-20354086

25.     Defendant Millikan is not insulated from liability simply because she saw Plaintiff and made some diagnosis. (*See Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002) (when need for treatment is obvious, medical care which is so cursory to amount to no treatment at all may amount to deliberate indifference); *Smith v. Jenkins¸* 919 F.3d 90, 93 (8th Cir. 1990) (grossly incompetent or inadequate care can constitute deliberate indifference; medical care so inappropriate as to evidence intentional maltreatment or refusal to provide essential care violates Eighth Amendment); *Howell v. Naphcare, Inc.*, 67 F.4th Cir. 2023) (A generic diagnosis that could cover almost any physical condition does not provide insulation from liability where correctional nurse failed to act in the face of an obvious, unjustifiably high risk of harm.)

26.     Any reasonable correctional care nurse who was not deliberately indifferent, who knew that inmate had Uveitis, and had an obvious flare up of that Uveitis would have sought timely consultation with a nurse medical provider or immediately ordered off-site medical treatment if that provider refused to order off-site medical treatment.

27.     Defendant Millikan did neither of these things and rather followed Turn Key's cost saving practices or customs of denying inmates access to providers and denying inmates access to outside medical treatment in order to keep costs low.

28.     At or around midnight, the Duty Sergeant contacted medical again stating that Plaintiff continued to complain of feeling like he would pass out. Again, rather than properly evaluating issues with Plaintiff's Uveitis or transporting him to an appropriate medical facility for necessary emergency treatment for his serious medical condition, Turn Key employees rather just used a sterile purified water ophthalmic solution to rise out his eye (*See* Id.) in an attempt to keep costs low for the facility and then cleared him to remain in the unit. (*See* Id. at p. 17).

29.     On March 28, 2020, between 4:30 a.m. and 5:00 a.m., another deputy in D unit contacted Turn Key employees stating that Plaintiff could not see at all out of his right eye. Plaintiff was again assessed. At this time his right eye continued to be tearing with red sclera and a clouded appearance over the iris and pupil. Defendant Millikan then contacted the provider, Defendant Roberts, APRN. (Id. at p. 39).

30.     Defendant Roberts was informed by Defendant Millikan of Plaintiff's serious medical condition, Uveitis, and his symptoms, which were the essential symptoms that indicated an acute uveitic emergency. Additionally, she knew or should have known of this condition due to Plaintiff's medical records. Despite knowing of Plaintiff's serious medical condition, the fact that Plaintiff was suffering the essential symptoms of an uveitic emergency which required immediate off-site emergency care, that failing to transport Plaintiff for immediate off-site emergency care could lead to permanent vision loss, Defendant Roberts chose to disregard Plaintiff's complaint.

31.     Rather, Defendant Roberts without physically examining Plaintiff's condition simply ordered prednisone ophthalmic solution and gentamycin ophthalmic antibiotic and to keep his right eye covered loosely. (Id.) These treatment options were not appropriate to treat an uveitic emergency and amounted to no treatment at all.

32.     Any reasonable correctional medical care provider who was not deliberately indifferent, who knew that inmate had Uveitis, and was suffering the essential symptoms that indicated an acute uveitic emergency would have immediately ordered off-site medical treatment.

33.     Defendant Roberts failed to order immediate off-site medical treatment and rather followed Turn Key's cost saving practices or customs of denying inmates access to providers, by

not physically examining Plaintiff, and denying inmates access to outside medical treatment in order to keep costs low.

34.     Defendant Roberts knew or should have known of the serious risks of failing to transport a patient suffering from acute Uveitis symptoms to an appropriate medical facility. Despite knowing of this risk, Defendant Roberts failed to order the immediate transport of Plaintiff to an appropriate medical facility for necessary emergency treatment for Plaintiff's serious medical condition.

35.     Defendant Millikan also knew or should have known of the serious risks of failing to transport a patient suffering from acute Uveitis symptoms to an appropriate medical facility. Defendant Millikan also knew or should have known that the severe exacerbation of a preexisting condition such as Uveitis necessitated an in-person physical examination by a qualified healthcare provider, not merely a call to a nurse practitioner who was not in the facility. Despite knowing of this risk, Defendant Millikan failed to order Plaintiff's immediate transport to an appropriate medical facility for necessary emergency treatment for Plaintiff's serious medical condition.

36.     Defendant Millikan had the ability to disregard the treatment orders of Defendant Roberts. Unlike a jail correctional employee who could reasonably rely on the orders of a medical provider, Defendant Millikan is not awarded that discretion. Defendant Millikan knew or should have known of the serious need for Plaintiff to receive outside treatment as she had conducted the physical examination of Plaintiff. Defendant Millikan should have exercised her discretion just like the anonymous Turn Key nurse often did as highlighted in the *Newsweek* story on Turn Key. (*See* fn. 1).

37.     In the alternative, Defendant Millikan failed to properly communicate the severity of Plaintiff's symptoms to Defendant Roberts and failed to advocate for her patient acting with deliberate indifference to his serious medical needs.

38.     Plaintiff was forced to suffer between March 28 – March 31 with excruciating pain and the inability to use his eyes. At no time during those four (4) days did Defendant Roberts ever physically examine Plaintiff or order the follow up examination of Plaintiff. Rather, Plaintiff was subjected to the continued inappropriate and insufficient regimen of purported treatment that actually amounted to no treatment at all.

39.     Between March 28 – March 31, Plaintiff informed each Turn Key employee that administered the inappropriately prescribed antibiotic and steroidal eye drops that the treatment was not helping, that his eye sight was deteriorating each day, and that he immediately needed to see a provider. These employees included but may not have been limited to Jesse James, Jamie Releford, Phil Brown, and Tabbitha Burton.

40.     Finally, on March 31, 2020, after unnecessarily suffering for four straight days Plaintiff was transferred to UAMS Emergency Department for emergency ocular surgery. (Id. at pp. 17-18.) Turn Key employees even logged that the medical transfer was for Vulvitis rather than Uveitis. Vulvitis is the inflammation of the vulva, an organ which Plaintiff, being male, does not even possess. (Id. at p. 17.)

41.     The offsite notification in Turn Key's system claims that the injury was not caused by Acts or Omissions by the County, that this was not a pre-existing condition, and that this was a new condition. (Id. at p. 18.) All of this information is patently false. Plaintiff's pre-existing condition was exacerbated by four days of receiving no examination, and thus no real treatment, whatsoever. The transfer occurred because Plaintiff's eye was swollen shut, his sclera

was completely red with a white cloud over his iris and pupil, Plaintiff could no longer open his eye, Plaintiff could no longer see out of his eye, and his eye was constantly draining. (Id.)

42.     On March 31, 2020, at or around 4:10 p.m. a UAMS employee, Pam, called requesting information about Plaintiff because he arrived in handcuffs with deputy supervision and was now uncuffed and unsupervised. Turn Key employee, Hannah Weatherly, informed Pam that Plaintiff was released and no longer in custody. (Id.)

43.     The sheer audacity that the County and Turn Key released Plaintiff from their custody while he received emergency ocular surgery in order to avoid paying his UAMS medical bills, which were the direct result of their deliberate indifference to his serious medical conditions shocks the conscious.

44.     Turn Key has a practice or custom of releasing inmates to avoid paying medical bills. (*See* fn. 1; *see also* Yolanda Lucas v. Turn Key Health Clinics, LLC, Case No. 4:20-cv-00601-TCK-CDL, filed Nov. 23, 2020, ECF No. 2, ¶ 46.)

45.     Plaintiff suffered permanent eye damage as a result of the actions of Turn Key and its employees.

### VI.
### CAUSES OF ACTION

#### COUNT 1 – VIOLATION OF 42 U.S.C. § 1983
#### (AGAINST PULASKI COUNTY)

46.     Plaintiff re-alleges paragraphs 1-44 of this Complaint as if set forth verbatim herein.

47.     As alleged above the County acting under color of state law, violated the rights of Plaintiff secured by the Fourteenth Amendment to the U.S. Constitution. Specifically, the Pulaski County Sheriff, Pulaski County Jail Director, Pulaski County Assistant Director of Jail

Programs, the Pulaski County Jail Medical Director, and the various other officials responsible for making policy with regard to the Sheriff's Department and Jail enacted policies and customs that were deliberately indifferent to and caused the violation of Plaintiff's constitutional rights.

48.    Further, Pulaski County, acting by and through its policymakers, officers, and agents, and acting under color of state law, violated the rights of Plaintiff secured by the Fourteenth Amendment to the U.S. Constitution.

49.    Defendant Pulaski County, acting by and through its policymakers, officers, and agents with deliberate indifference, implemented customs and policies and/or at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the individuals who violated the above-described constitutional rights of Plaintiff. These policies and customs directly and proximately caused the above-described constitutional rights violations.

50.    In the alternative, Defendant Pulaski County, acting by and through its policymakers, officers, and agents with deliberate indifference, failed to properly hire or train its agents and employees with respect to their responsibilities in ensuring that they provide reasonable medical care, which proximately caused the above-described constitutional rights violations.

## COUNT 2 – VIOLATION OF 42 U.S.C. § 1983
### (AGAINST TURN KEY)

51.    Plaintiff re-alleges paragraphs 1-44 of this Complaint as if set forth verbatim herein.

52.    At all times relevant to this Complaint, the Turn Key acted under color of law, performed government functions, was entwined in a symbiotic relationship with Pulaski County, and were otherwise engaged in state action consistent with the Supreme Court's analysis in

*Brentwood Acad. V. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288 (2000). Turn Key is a "person" within the meaning of 42 U.S.C. § 1983.

53.     Turn Key directly participated in and proximately caused the above-described constitutional rights violations by instituting policies and customs described herein with deliberate indifference to the serious medical needs of individuals like Plaintiff, specifically including, but not limited to, Turn Key's policies of permitting unqualified personnel to conduct medical examinations and simply convey symptoms to medical providers by telephone, failing to require medical providers examine pre-trial detainees in person within a reasonable time of their injury, and its policy of failing to transport pre-trial detainees with acute, emergent medical conditions to UAMS or another medical facility for necessary acute or emergency medical treatment.

54.     To the extent that Turn Key claim their subordinates are the actual persons who were deliberately indifferent to the serious medical needs of Plaintiff and that they were not personally involved themselves, Turn Key at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of these offending subordinates. As a result, Turn Key is personally liable under Section 1983. *See Tilson v. Forrest City Police Dep't*, 28 F.3d 802, 806-07 (8th Cir. 1994). (A supervisor may be held liable under § 1983 if he directly participated in the constitutional violation or if his failure to train or supervise the offending actor caused the deprivation. A plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate.)

55.     Turn Key, acting by and through its policymakers, officers, and agents with deliberate indifference, implemented customs and policies and/or at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the individuals who

violated the above-described constitutional rights of Plaintiff. These policies and customs directly and proximately caused the above-described constitutional rights violations resulting in Plaintiff's unnecessary suffering.

56.     In the alternative, if Turn Key claims that the conduct described herein is contrary to its policies, then Turn Key, acting by and through its policymakers, officers, and agents and with deliberate indifference, failed to properly train or supervise its agents and employees with respect to their responsibilities in ensuring that they provide reasonable medical care, which proximately caused the above-described constitutional rights violations.

### COUNT 3 – VIOLATION OF 42 U.S.C. § 1983
### (AGAINST DEFENDANTS ROBERTS AND MILLIKAN)

57.     Plaintiff re-alleges paragraphs 1-44 of this Complaint as if set forth verbatim herein.

58.     At all times relevant to this Complaint, the Defendants Roberts and Millikan acted under color of law, performed government functions, were entwined in a symbiotic relationship with Pulaski County and were otherwise engaged in state action consistent with the Supreme Court's analysis in *Brentwood Acad. V. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288 (2000). The Turn Key Nurses are "persons" within the meaning of 42 U.S.C. § 1983.

59.     Defendants Roberts and Millikan, acting with deliberate indifference, directly participated in and proximately caused the above-described constitutional rights violations by deliberately ignoring Plaintiff's serious medical needs.

60.     Defendants Roberts and Millikan were responsible for providing treatment and care to Plaintiff during his pre-trial detainment at the Jail and were responsible for providing and/or supervising the medical treatment of Plaintiff.

61.     A layperson would be aware that Plaintiff's symptoms indicated a need for acute

or emergency medical care and, at a minimum, an in-person examination by a medical provider.

62.     Any reasonable correctional medical care nurse or provider who was not deliberately indifferent, who knew that an inmate had Uveitis, and was suffering the essential symptoms that indicated an acute uveitic emergency would have immediately ordered off-site medical treatment.

63.     Defendants Roberts and Millikan knew or had reason to know that Plaintiff had a serious medical need that required immediate emergent treatment and that there was a risk that Plaintiff would suffer immensely or lose his eye sight if he did not receive immediate emergent treatment.

64.     Defendant Millikan was informed of that risk by Plaintiff and initially disregarded that risk by failing to contact a medical provider or provide any treatment at all other than ice chips. After causing Plaintiff to inappropriate suffer for hours, Defendant Millikan eventually relayed information to Defendant Roberts after a second visit by Plaintiff for his worsening condition.

65.     Defendant Millikan inexcusably disregarded that risk by failing to adequately and accurately document Plaintiff's medical conditions, schedule an examination by one of the Jail's medical providers, or originally even call a medical provider.

66.     Defendant Roberts inexcusably disregarded that risk by failing to physically examine Plaintiff, order immediate transport to off-site medical care, or even order follow up examination by a medical provider at the Jail.

67.     Defendant Millikan further inexcusably disregarded that risk by failing to immediately transport Plaintiff for emergency medical care when Defendant Roberts was not physically present in the facility or to bypass Defendant Roberts' treatment orders and order the

immediate transport of Plaintiff to an off-site emergency care facility.

68.    Defendants Roberts and Millikan further inexcusably disregarded that risk by failing to respond to Plaintiff's calls for help, by failing to recognize that Plaintiff's Uveitis was in need of emergent care, by failing to respond to Plaintiff's serious medical need even after he informed them he was about to pass out, and by failing to immediately transport Plaintiff to UAMS or another appropriately equipped facility to ensure that Plaintiff received necessary emergency ocular surgery necessary to save his vision.

69.    Defendants Roberts and Millikan were subjectively aware of a serious risk to Plaintiff and disregarded that risk by failing to take reasonable steps to abate it. Defendants Roberts and Millikan, acting recklessly and with deliberate indifference, chose to ignore Plaintiff's serious medical needs and did not provide the medical care that they were aware he required. All of the failures of Defendants Roberts and Millikan to properly examine, treat, or transport Plaintiff to UAMS in a timely manner was so woefully inadequate as to amount to no treatment at all.

70.    Defendants Roberts and Millikan's failures to provide necessary medical care resulted in Plaintiff suffering excruciatingly pain for four (4) days as he lie in his bed unable to open his eyes.

71.    Ultimately, Defendants Roberts and Millikan's failures resulted in permanent vision loss to Plaintiff.

## IX.
## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants on each Count of the Complaint and prays for the following relief:

1.    Permit Plaintiff leave to amend this Complaint after reasonable discovery;

2.      Empanel a jury to try this matter;

3.      Award Plaintiff compensatory damages, both economic and non-economic;

4.      Award Plaintiff punitive damages;

5.      Award Plaintiff his reasonable attorney's fees, costs, and expenses pursuant to 42 U.S.C. § 1988 and Ark. Code Ann. § 16-123-105(b);

6.      Award costs and expenses incurred in this action pursuant to Rule 54 of the Federal Rules of Civil Procedure; and

7.      Grant the Plaintiff such further relief as the Court may deem just and proper.


Respectfully submitted,


*/s/ Craig A. Edgington*
Craig A. Edgington (#38205)
Brice M. Timmons (#29582)
DONATI LAW, PLLC
1545 Union Avenue
Memphis, TN  38104
(901) 278-1004 (Office)
(901) 278-3111 ( Fax)
craig@donatilaw.com
brice@donatilaw.com


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served on all defendants via this Court's ECF filing system this 23rd day of June.

*/s/ Craig A. Edgington*